IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON

Assigned on Briefs August 5, 2020

**STATE OF TENNESSEE v. KWASI CORBIN**

**Appeal from the Criminal Court for Shelby County**
**No. 16-06362     Lee V. Coffee, Judge**

_____

**No. W2019-01229-CCA-R3-CD**

_____

The Defendant, Kwasi Corbin, was convicted by a Shelby County Criminal Court jury of first degree premeditated murder, attempt to commit first degree murder, a Class A felony, and employing a firearm during the commission of a dangerous felony, a Class C felony. *See* T.C.A. §§ 39-13-202 (2014) (subsequently amended) (first degree murder), 39-12-101 (2018) (criminal attempt), 39-17-1324 (2018) (subsequently amended) (firearm violation). The trial court imposed a life sentence for the first degree murder conviction and sentenced the Defendant to twenty-five years for the attempted first degree murder conviction and to six years for the firearm violation. The court ordered consecutive service, for an effective sentence of life imprisonment plus thirty-one years. On appeal, the Defendant contends that (1) the evidence is insufficient to support his convictions and (2) the trial court erred by limiting witness testimony at the trial. We affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

ROBERT H. MONTGOMERY, JR., J., delivered the opinion of the court, in which D. KELLY THOMAS, JR., and J. ROSS DYER, JJ., joined.

Shae Atkinson (on appeal) and Lauren Pasley (at trial), Memphis, Tennessee, for the appellant, Kwasi Corbin.

Herbert H. Slatery III, Attorney General and Reporter; Ronald L. Coleman, Assistant Attorney General; Amy P. Weirich, District Attorney General; Alanda Dwyer and Kevin McAlpin, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

The Defendant's convictions relate to a May 2016 shooting, in which Myneishaia Johnson suffered a fatal gunshot wound and Courtney Abston suffered a non-fatal gunshot wound to the buttocks. At the trial, Jacqueline Carruthers, Ms. Johnson's aunt, testified

that Ms. Johnson was age eighteen at the time of the shooting and that Ms. Johnson would have graduated from high school one week later. Ms. Carruthers identified photographs of Ms. Johnson taken before and after the shooting.

Rodneshia Green, Ms. Johnson's cousin, testified that on the night of the shooting she, Ms. Johnson, and a man known to her as Fredrick went to Beale Street around 10:30 or 11:00 p.m. to have fun. Ms. Green said that they met Ms. Green's bother, Chris Green, and his friends at Beale Street. Ms. Green recalled that before everyone could enter Beale Street, each person was "searched" for security purposes. She said that she did not know Albert Jones and that Mr. Jones was not with her group.

Ms. Green testified that her group, which included eight to nine people, left Beale Street and walked toward Kooky Canuck. She recalled the area was "busy" that night. She said that as the group walked, a black car "swerv[ed] in traffic" driving toward Beale Street. She said that the car stopped, that the driver lowered the dark-tinted window, that she looked at the driver, who she later identified as the Defendant, and that the Defendant pointed a firearm and began shooting. She said that the Defendant fired one shot, paused, and fired a second shot. She said that the group ran, that Ms. Johnson ran behind her, and that Britney Owens ran beside her. Ms. Green recalled that the second gunshot struck Ms. Johnson and that Ms. Green and her brother ran to Ms. Johnson, who lay on the ground. Ms. Green said that the black car had been stopped at a traffic light before the shooting and that the car drove away when the light turned green. Ms. Green identified the direction in which the car drove from the scene. She said that she did not know the Defendant at the time of the shooting. She said nobody in her group had a firearm.

On cross-examination, Ms. Green testified that Mr. Abston was not in her group on the night of the shooting. She identified "Little B" as a friend and said he was on Beale Street. She identified "Little Chris" as her brother and "Dee-Dee" and "Yancey" as her brother's friends and said they were in her group. She denied that Mr. Abston was her brother's friend and said that she did not see Mr. Abston on the night of the shooting. She said she knew that nobody in her group had a firearm because everyone walked through a metal detector to gain access to Beale Street.

Ms. Green testified that only one car was stopped in front of the black car at the traffic light. She said the Defendant's driving caught her attention. She said the car was "bucking and swerving in every lane," although she did not see any obstacles in front of the car or any vehicles preventing the car from "moving around." She said that the Defendant did not speak to anyone and that nobody spoke to the Defendant. She recalled that the Defendant and the members of her group stared at each other. Ms. Green clarified that she did not see Mr. Abston before the shooting, only afterward.

-2-

Roderick Green, Ms. Green's brother, testified that he met Ms. Johnson and Ms. Green after work on the night of the shooting. He recalled meeting the women around 11:00 p.m. and said he intended to meet them, along with his brother Chris Green. Although Mr. Green did not recall the size of the group, he said multiple people walked toward Kooky Canuck. He said that he saw a car swerve, which he described as reckless driving, and that the car was "like the car on Fast and Furious." He said that the windows were up when he first saw the car, that the driver lowered the window and fired a gun, and that he ran. He said that Ms. Johnson and his sister stood in front of him before the shooting began. Although he described the gun as big, Mr. Green said he was unable to see the driver.

Mr. Green testified that after he ran, he saw Mr. Abston, whom Mr. Green had seen earlier walking up the street. Mr. Green recalled that Mr. Abston was talking to the police after the shooting and said Mr. Abston's pants were down. A video recording obtained from "Heuy's" was played for the jury. Mr. Green stated that the recording depicted Mr. Abston with his red and white pants down at the scene, a police officer standing with Mr. Abston, and two additional people, whom Mr. Green did not know. Mr. Green stated that Huey's and Kooky Canuck were located on the same street.

Mr. Green testified that he did not know the Defendant and that he did not have knowledge about a dispute between the Defendant and Mr. Abston. Mr. Green said that the shooter fired one shot, paused, and fired a second shot.

On cross-examination, Mr. Green testified that Ms. Green had been untruthful if she had testified that he was not present during the shooting. He said that his brother, Chris Green, was present, along with Murico Patterson, Miktavis Jackson, Damon Malone, Frederick Brown, and Britney Owens. Mr. Green denied knowing Dee-Dee, although Mr. Green had identified Dee-Dee in Mr. Green's police statement. Although Mr. Green's police statement reflected that Mr. Abston was "put off Beale Street" on the night of the shooting because of an argument, Mr. Green denied witnessing this incident. Mr. Green said that someone told him about the incident. Mr. Green initially agreed that he and Mr. Abston were friends and grew up together but later said that Mr. Abston was not a friend and was only someone he knew. Mr. Green denied that his sister and brother knew Mr. Abston and said that he was the only person who "hung around" Mr. Abston.

Britney Owens testified that she grew up with Ms. Johnson and that she went to Beale Street on the night of the shooting with Ms. Johnson and Ms. Green. Ms. Owens recalled that her group contained nine or ten people, who were searched by security before entering Beale Street. She said that the group walked toward Kooky Canuck and that she saw a black car pull up. She said that the dark-tinted windows on the car were up initially, that the Defendant, who was the driver, lowered the window. She said that she thought the Defendant was nodding his head to music but that the Defendant pointed a firearm, that

she and everyone in the group ran in different directions, and that she heard two gunshots. Ms. Owens said Ms. Johnson was shot during the incident. Ms. Owens stated that she did not know Mr. Jones.

On cross-examination, Ms. Owens testified that Dee-Dee, Frederick Barnes, "Lil Black," Tay-Tay, and Latonya Jackson were with her group. Ms. Owens said that Roderick Green was not with her group on Beale Street and that Chris Green was with her group after leaving Beale Street.

Ms. Owens testified that she saw many cars just before the shooting began and that she saw two or three cars in front of the black car. She said that she did not notice anything particular about the black car before the shooting but that the Defendant was singing inside the car. She said that Mr. Abston was not with her group but that she saw Mr. Abston on the night of the shooting. She agreed she and Mr. Abston were friends.

Ms. Owens testified that she had never seen the Defendant before the shooting and that she and the Defendant had never been involved in an altercation. When asked if anyone in her group had a "feud" with the Defendant, she stated, "Not right then."

Shelby County Sheriff's Deputy Juaquatta Harris testified that she monitored and disseminated jail telephone calls. She said that she obtained the recording of a May 22, 2016 jail call placed by the Defendant at 11:05 a.m. The recording was played for the jury.

In the recording, an unidentified woman stated that the police had charged the Defendant but that the police did not know if the Defendant "did it." The Defendant replied, "They know I did it because they know I was the only one shot baby." The woman said, "Bullets fly." The Defendant stated, "I know but I told them it don't even matter if they charge me with it. She wasn't my target."

Memphis Police Officer Farrell Brasell testified that he was working near the scene at the time of the shooting and that he heard two or three gunshots. He said that he saw a black car speed from the scene, that the black car "bumped" another vehicle before driving away, and that he saw Ms. Johnson lying on the ground. He said that the gunshots were loud and that, based upon the sound, he knew the firearm used in the shooting was a rifle or a high-powered weapon. Officer Brasell said that he did not see anyone running from the scene with a firearm.

On cross-examination, Office Brasell testified that the scene was crowded before the shooting. He said that, based upon the sound, the gunshots came from the same firearm. He said that about five minutes after he saw Ms. Johnson lying on the ground, he saw Mr. Abston, who had been shot in the buttocks.

Thomas Hazzle testified that around midnight on the night of the shooting, he and his brother were riding in a car downtown. He said that when they were stopped at a traffic light, he saw gunfire coming from "a couple of cars in front" to his left. He heard two gunshots. He said that he looked to his left and saw a young woman fall, that his brother parked the car, and that he ran to check on the woman. Mr. Hazzle said that his car was in the right lane of travel and that the gunshots came from a black Nissan Maxima in the left lane. Mr. Hazzle said that he could not see inside the Maxima because it had tinted windows. He said he did not see anyone else with a firearm. Mr. Hazzle said that he stayed at the scene until a paramedic arrived.

Mr. Hazzle testified that he and his brother left and drove around the area, that he saw yellow police tape, that he assumed the woman had died, and that they returned to the scene. Mr. Hazzle said he spoke to an officer about the woman's condition and what he had seen.

On cross-examination, Mr. Hazzle testified that he thought the gunshots came from the passenger side of the Maxima because the woman fell to the left. Although he did not recall how many, he saw several people standing around the woman.

Memphis Police Officer William Forrester testified that he was working near the scene at the time of the shooting, that he drove to the scene, and that he spoke to an unidentified officer and an unidentified security guard in front of Huey's. Officer Forrester stated that he encountered Mr. Abston, who was bleeding from a gunshot wound to the buttocks. Officer Forrester said that ambulances took Mr. Abston and Ms. Johnson to the hospital.

Memphis Police Officer Myron Grafenreed testified that he worked in the Realtime Crime Center, which utilized cameras around Memphis to observe crowded events and traffic. He said that he monitored police radio traffic in order to determine if cameras needed to focus on specific areas and events. He said that on the night of the shooting but before it occurred, he was monitoring police radio and the Beale Street Entertainment District. He said that he noticed officers were "reacting to something" and heard radio transmissions about a possible shooting. Officer Grafenreed said that he reviewed the video footage captured by the cameras in the area and downloaded four recordings. Although Officer Grafenreed stated that none of the cameras in the area captured the shooting, four recordings captured events following the shooting. Officer Grafenreed explained the contents of the recordings as they were played for the jury.

The first recording reflected that on May 22, 2016, at 12:30 a.m., the traffic light previously identified by witness testimony had just turned red. A black Nissan Maxima ran the red light and almost struck a pedestrian in a crosswalk. The second recording depicted the same events as the first recording but reflected a wider camera view. Officer

Grafenreed testified that the red light was located one block east from where the shooting occurred. Officer Grafenreed said that the third recording provided a "wider pan of all the activity in the area" and that this recording allowed him to "zero in" on the black Nissan Maxima that ran the red light. The recording reflected that at 12:30:39 a.m., the black car went toward the sidewalk, stopped, drove around a vehicle in front of it, and drove through the intersection at the traffic light. Officer Grafenreed said that, based upon the previous recordings, the light was red at the time the car drove through the intersection, almost striking a pedestrian. The fourth recording reflected "a portion of the path of the vehicle pursuit" two blocks away from the scene of the shooting. The recording reflected that at 12:32:09 a.m., the black Nissan traveled at a high rate of speed while being pursued by three police cruisers.

On cross-examination, Officer Grafenreed testified that he and the other officers in his unit examined "the gamut of the entertainment district cameras" looking for anything that might have been connected to the shooting. He said that, as a result, it took several hours to locate the recordings played for the jury.

Memphis Police Officer David Voyles testified that he received information about the shooting and about the shooter's vehicle traveling in a specified direction. He said that he drove in the direction of the black Nissan, that he saw the car, and that he was able to pull behind the car. Officer Voyles said that the car was traveling fast and that during the pursuit, the Defendant, threw out "something black with a T-shirt wrapped around it." Officer Voyles stated that he later learned the Defendant had thrown out a rifle. Officer Voyles said that he advised the other officers that the Defendant had thrown something from the car and that he continued following the car. Officer Voyles said that something "blew" on the car and that the car slowed, began to smoke, and crossed the median into oncoming traffic. He said that the Defendant "bailed out of the car" and ran but that the Defendant was detained after a short foot chase.

Officer Voyles testified that at the time of the shooting, his police cruiser did not have a dash camera and that he did not wear a body camera. He said the police chase lasted about five minutes.

Memphis Police Officer Roderick Knight testified that he participated in the police pursuit and that his police cruiser was the only one with a dash camera that night. He said that he stopped during the pursuit to recover the items thrown from the car. He said that inside a rag or shirt was a black firearm. He said that he waited for another officer to arrive to secure the firearm, that he returned to the pursuit, that the Defendant's car was stopped by the time he arrived, and that he returned to where the firearm had been found. Officer Knight said that the firearm was an assault rifle. A recording from the dash camera inside Officer Knight's cruiser was played for the jury and was consistent with his testimony.

Memphis Police Officer Michael Tippett testified that he was working three blocks from the scene at the time of the shooting, that he heard the police radio transmission about the shooting and police pursuit, and that he joined in the pursuit. Officer Tippett said that during the pursuit, the Defendant threw something out of the car and that he learned later the object was a firearm. Officer Tippett said that the engine on the Defendant's car "blew," that the Defendant left the car, that the Defendant looked at him, and that the Defendant returned to the car and "gunned it." Officer Tippet said that the car drove over the median, flipped a "few times," and stopped in front of his police cruiser. Officer Tippett said that the Defendant ran and that he chased the Defendant on foot. Officer Tippett recalled that the car was still moving when the Defendant ran. Officer Tippett said that he never lost sight of the Defendant before apprehending him. On cross-examination, Officer Tippett clarified that the Defendant rolled after leaving the car and that the car did not roll during the pursuit.

Memphis Police Officer Matthew Wheeler testified that he worked with Officer Tippett on the night of the shooting. He said that he heard the police radio transmissions about the shooting and the police pursuit of a black car and that he joined the pursuit, as well. His testimony regarding the police pursuit was consistent with other police officer testimony. He said that the chase reached above 100 miles per hour on the interstate and that he was the last police officer pursuing the Defendant.

Officer Wheeler testified that after the Defendant fled on foot, he searched the Defendant's car for weapons but found none. A video recording from Officer Wheeler's police dash camera was received as an exhibit and played for the jury. The recording was consistent with Officer Wheeler's testimony regarding the police pursuit and his securing the Defendant's vehicle after the Defendant fled on foot.

Memphis Police Sergeant John Stone, an expert in crime scenes, testified that he responded to the location where the police pursuit occurred. He said that he took photographs, which were received as exhibits, and that he recovered the rifle, the shirt in which the rifle was wrapped, and a pink tank top. Sergeant Stone recalled that the rifle had one bullet inside the chamber, which he said meant either that someone had put one bullet in the chamber or that someone had fired the rifle and a bullet "cycled through to the chamber." He said that if the rifle were fired, another bullet entered the chamber automatically. He said the rifle was a semi-automatic firearm and contained seven live Hornaday "308 Winchester rounds."

Sergeant Stone testified that he also collected evidence at the scene of the shooting. Photographs, received as exhibits, reflected possible blood stains, two cartridge casings, a "red marker lens," Ms. Johnson inside an ambulance, a strike mark on a wall near a storm drain, blood and clothes, and the location where Ms. Johnson fell after being shot. He said that the cartridge casings were 308-caliber Hornady cartridge casings and that this

ammunition was the same manufacturer as the bullets found inside the rifle recovered from the scene of the police pursuit.

Sergeant Stone testified that the red marker lens was a portion of a tail light lens and that this evidence was consistent with previous testimony that the black car had "bumped" another vehicle in the process of leaving the area.

On cross-examination, Sergeant Stone testified that the rifle was recovered about eight-tenths of one mile from where the black car stopped. He said that he did not process the car for evidence at the scene because it was towed to a police facility before a search warrant was obtained. He recalled that the driver's side window was down.

Sergeant Stone testified that the photographs of the cartridge casings at the scene of the shooting depicted how he found them but that they could have been "moved by endless personnel" who assisted Ms. Johnson before he arrived. He said the red lens was found in the far left lane of the roadway. He said that the strike mark on the wall did not leave behind bullet fragments. He did not know if a bullet caused the strike mark.

Dr. Paul Benson, an expert in forensic pathology, testified that he performed Ms. Johnson's autopsy. Dr. Benson stated that Ms. Johnson suffered a gunshot wound in which the bullet entered the left buttock and exited the abdomen near the belly button. Photographs depicting the entrance and exist wounds were received as exhibits. Dr. Benson said that the he did not see evidence of a "close range discharge" of the firearm on the skin around the entrance wound. He concluded that the wound was an indeterminant-range entrance wound, which was consistent with a wound inflicted by a high-powered rifle. He said that x-rays showed multiple bullet fragments throughout the torso and a pelvic fracture caused by the gunshot wound. He said that the bullet breakup was typical of rifle bullets. He said that the bullet had transected the left iliac artery, had injured the liver, and had "blown the kidney to bits." He said that these injuries were inconsistent with a handgun and were consistent with a high-powered rifle and with 308-caliber ammunition. Dr. Benson said the toxicology report reflected that Ms. Johnson's blood was negative for drugs and alcohol. He concluded that Ms. Johnson's cause of death was a gunshot wound to the torso and that the manner of death was homicide.

On cross-examination, Dr. Benson testified that although his report did not state explicitly that he examined Ms. Johnson's clothes, he would have examined the clothes in order to determine that the shooting occurred at an indeterminant range. He said he did not find clothes inside the entry wound caused by the entering bullet and that generally, this occurred with the use of a low-power firearm, such as a handgun loaded with hollow point bullets. He did not know if 308-caliber Hornady bullets were hollow points.

Memphis Police Officer Michael Coburn, an expert in crime scene analysis, testified that he examined the Defendant's black Nissan Altima after it was received at the crime scene laboratory. Photographs of the car, which were received as exhibits, depicted clothes, multiple live bullets, a brown Louis Vuitton handbag, and boxes of ammunition. He said that he found two live bullets inside the driver's side door and that the handbag contained a live 9-millimeter bullet. He said that a black duffle bag in the trunk contained a box of Blazer 5.56 by 45-millimeter live bullets and that these bullets were used in rifles, such as an M16. He said that the box contained approximately fifty bullets. He found .45-caliber live bullets in the middle console.

Officer Coburn testified that the 5.56 by 45-millimeter bullets were used by a military rifle known as PAM16, a medium range assault rifle, and that a 308 assault rifle did not use these bullets. He said that the .45-caliber bullets were used by .45-caliber handguns, not rifles. He said the same for .40-caliber and 9-millimeter bullets.

Officer Coburn testified that a vehicle without tinted windows could appear to have tinted windows depending on lighting and glare and that lightly tinted windows could appear darker under the proper lighting.

On cross-examination, Officer Coburn testified that the rear windows of the black car were "lightly tinted." He said that ammunition was the only thing inside the duffle bag and that he found clothes inside the trunk. He agreed that, generally, possession of the items found inside the car, including the ammunition, was not unlawful to possess.

William Merritt, Criminal Investigator for the Shelby County District Attorney General's Office, testified that he examined the scene of the shooting. He said that Mr. Abston had been shot during the shooting, that he spoke to Mr. Abston shortly after the shooting occurred, and that Mr. Abston was cooperative at this time. Mr. Merritt said, though, that he had not been able to locate Mr. Abston recently, that he requested assistance from law enforcement agencies to located Mr. Abston, and that nobody had been able to find Mr. Abston.

Tennessee Bureau of Investigation Special Agent Kasia Lynch, an expert in firearms identification, testified that she received a semi-automatic "DPMS" 308-caliber Winchester rifle, nine 308-caliber live rounds, two 308-caliber cartridge casings, and bullet fragments removed from Ms. Johnson. Relative to the rifle, she said that the magazine clip held twenty live rounds, excluding an additional round in the chamber. She said the rifle fired 308-caliber Winchester rounds. She was unable to conclude whether the cartridge casings recovered from the scene were fired from the same firearm and whether the cartridge casings were fired from the rifle because the cartridge casings did not have enough individual characteristics.

Agent Lynch testified that the cartridge casings recovered from the scene were Hornady and that the live rounds inside the rifle were Hornady, as well. She said that Hornady made approximately eighteen different 308-caliber Winchester bullets and that the rifle was loaded with jacketed hollow point bullets. She said that a hollow point bullet expanded when it struck a target and had more "stopping power." She said that the cartridge casings found at the scene were the correct caliber to be fired from the rifle. Agent Lynch stated that the bullet fragments were small and did not have any characteristics for comparison purposes and that she could not conclude that the fragments came from a bullet fired by the rifle.

On cross-examination, Agent Lynch testified that the rifle did not leave behind individual characteristics on cartridge casings. She agreed she could not determine whether the bullet fragments came from the cartridge casings found at the scene. She could not determine the caliber of bullet that left behind fragments because the fragments were too small and too few. She said that she was not called to the scene in order to perform a trajectory analysis.

On redirect examination, Agent Lynch testified that the two cartridge casings were Hornady 308-caliber, that the rifle was a 308-caliber, that the live rounds in the rifle were Hornady, and that the cartridge casings "could have" been fired from the rifle. She said, though, she could not make a definitive conclusion because of a lack of characteristics left behind on the cartridge casings.

Memphis Police Officer Dennis Evans, an expert in cell phone forensics, testified that he extracted cell phone data from the Defendant's cell phone. Officer Evans said that the Defendant's phone sent a text message on May 21, 2016, at 12:21:56 a.m., stating, "I'm OG." Officer Evans said that the message included photographs of the Defendant holding a rifle. Officer Evans said that at 12:22:03 a.m., the Defendant's phone sent a message to the same contact stating, "[M]y new chopper." Officer Evans said that at 12:28:05 a.m., the Defendant's phone received a message from the same contact inquiring about when the Defendant obtained the rifle, and the Defendant's phone sent a response stating, "[T]oday. I traded my handgun."

Christopher Robinson, a forensic firearms and ballistics expert, testified for the defense that he reconstructed the scene of the shooting in order to determine how Ms. Johnson was shot. He identified a photograph that was previously received as an exhibit of a strike mark on a wall near the scene. Mr. Robinson stated that, based upon the circumstances of the shooting, the bullet that struck Mr. Johnson hit the ground and raised up at a twenty-five degree angle, passed through Ms. Johnson, and struck the wall leaving behind the strike mark.

Mr. Robinson testified that he examined the rifle, live rounds, cartridge casings, and bullet fragments. He said that the bullet which struck Ms. Johnson had not been recovered and that only fragments of the bullet had been recovered. He said that the bullet which struck Ms. Johnson traveled at 1800 miles per hour, that the bullet continued after it struck her pelvis, and that the bullet appeared to have left a defect in the nearby wall. He said that a hollow point bullet heated as it traveled, that the metal became soft, and that the bullet could fragment due to speed when it struck a hard surface. Mr. Robinson stated that the cartridge casings had "breech face marks" and that the marks should have been matched back to a firearm.

Mr. Robinson testified that the shooter would have stood on the roadway or sat inside a car at the time of the shooting. He said that the weapon was fired about eight feet away from Ms. Johnson and that the bullet struck the ground, ricocheted off the ground, and struck Ms. Johnson at a twenty-five degree upward angle. He said that a ricocheted bullet found the "path of least resistance," although the bullet would travel within a general vicinity. He concluded that the shooter did not stand within eight feet of Ms. Johnson firing upward from the ground.

On cross-examination, Mr. Robinson testified that he did not test fire the rifle. He said that the defect in the wall came from the bullet based upon Ms. Johnson's standing in front of the wall. He noted that photographs of the scene showed blood on the sidewalk. The recording of the jail telephone call was played for Mr. Robinson. Afterward, he agreed that the Defendant fired the weapon but that the Defendant's admission did not alter his analysis, opinions, and conclusions.

On redirect examination, Mr. Robinson testified that, in his opinion, Ms. Johnson stood upright, based upon the totality of circumstances, the evidence obtained from the scene, and the autopsy report. Upon examination by the trial court, Mr. Robinson said that if the evidence showed Ms. Johnson was running when she was shot, his analysis did not change. He said that Ms. Johnson was upright, which was the critical point.

The Defendant testified that he was age nineteen at the time of the shooting and age twenty-two at the time of the trial. He said that around May 22, 2016, he lived in his car but "was kind of home from home." He said that before the shooting, he left his son's mother's home. He said that he drove to Beale Street around midnight, that traffic was "bumper to bumper," that his car had low gas, and that he called a friend for assistance. The Defendant said that, as the call ended, he saw "some men where I had had some incidents with." The Defendant said that he saw Albert Jones, Courtney Abston, and a man he identified as "Perry."

The Defendant testified that the men were about three car lengths away from his car and that they stared at him as they walked across the street. The Defendant said that when the men reached the sidewalk, Mr. Jones "pulled out a gun." The Defendant said, "I never seen Courtney gun, I never seen Perry gun, but they were acting as if they [were going to] pull a gun too." The Defendant thought the men were going to shoot him. He said that in 2014, Mr. Jones shot him in the face and that, as a result, the Defendant knew Mr. Jones would shoot him again. The Defendant said that he and Mr. Jones grew up together and that they had stayed overnight in each other's homes. The Defendant said that he knew Mr. Abston through Mr. Jones and said that they were all friends "once upon a time."

The Defendant testified that after Mr. Jones shot him in the face in 2014, a post-shooting photograph was posted on the Internet. The Defendant said that although some people sent him get-well wishes, others made fun of him and his injuries. He said that Mr. Abston "made a picture" of him and posted it on the Internet, that people made fun of him, and that "a lot of people was saying like I'm a snitch" because Mr. Jones went to jail for the shooting. The Defendant said that "they" were going to kill him on the night of the shooting because Mr. Jones shot him. The Defendant recalled having to "watch his back."

The Defendant identified the photograph of his face that was posted on the Internet in 2014. The Defendant stated that the bullet struck his right eye and caused swelling around his eye. The Defendant said that afterward, a lot of people recognized him wherever he went, that some people were angry with him for reporting Mr. Jones to the police, and that this "created a lot of tension." The Defendant said that he could not go anywhere because he feared being hurt, shot, and "jumped." He said that, as a result, he "had to keep a gun" because he feared being "harmed regardless" and that he wanted to protect himself. He said that after the 2014 shooting, he did not associate with Mr. Jones and Mr. Abston.

The Defendant testified that on the night of the shooting in the present case, the area was "jammed packed," that he was focused on the men and "these guns," and that he did not notice other groups of people in the area. He said that the men were pulling "whatever they had" from their pants and that the "they [were] getting ready to pull a gun." The Defendant said that he grabbed and held his firearm as "a scare tactic to keep them from firing" at him. He said,

> And when he aimed the gun I fired, but I fired like it wasn't one of those fire like I'm watching him. I fired this one load like really because I'm thinking he already -- he was shooting I'm already in shell shock from the fire of the gun.
>
> When I fired the gun everybody like was at a pause. . . . It was just like a standstill. . . .

-12-

So I shot again, I already knew by the second shot by them seeing where the shots coming from it's gone create a diversion. People gone scatter. It's gone give me chance enough to drive off. I know cars gone get to moving because people not trying to get shot.

The Defendant testified that he "scraped" a car as he drove away. He said that his car was in the center lane, that he drove straight through the intersection, and that he turned left onto another roadway. He said that he drove at a high rate of speed because he could not "watch [his] back" and because he was alone. He said he tried to get as far as a possible from the scene. He said that he did not stop when he saw police cars because the officers knew he had fired a weapon and considered him "armed and dangerous." He said that he panicked and that he planned to "get rid" of the firearm before stopping the car in order to ensure his safety.

The Defendant testified that he did not know he had shot Ms. Johnson. He said that his "gun didn't hit nobody." He said that he "wasn't running from a murder charge" and that he ran because he knew he had the firearm and knew he "was just foolishly recklessly shooting" on Beale Street. He said that it never occurred to him that Ms. Johnson died. He denied having the intent to kill Ms. Johnson and Mr. Abston. He said that he "wasn't against" the men, even if the men had called him a snitch, that they were against him, and that he did not want to be the aggressor toward them. The Defendant said that they were the aggressors "toward [him] from a friend that of theirs that shot [him]." The Defendant said the men made him the enemy. He said the problem started with jokes on the Internet and "grew into something worse." He said that he stopped frequenting "certain neighborhoods" because he would be harmed and that he tried "to steer clear" of the areas where he thought Mr. Jones, Mr. Abston, and Perry might have been.

The Defendant testified that Mr. Abston posted comments on Facebook about the Defendant's face after the 2014 shooting. The Defendant said that the night of the shooting in the present case was the first time he had seen Mr. Jones and Mr. Abston since the Facebook comments were posted. The Defendant said that he feared for his life when he saw Mr. Abston because of previous incidents of violence directed toward him.

On cross-examination, the Defendant testified that he was bullied on the Internet but that he had never bullied anyone. He identified two photographs and said he posted them on the Internet. He said that one photograph was posted on the Internet on April 17, 2016, and that the caption was "Crash all day every day," which he identified as the name of a song he had written. He said that "Crash Mob" was his rap name and was not affiliated with a "gang." The second photograph depicted a group of people, and the Defendant identified himself in the photograph. He denied that he owned many firearms but agreed that he traded two handguns the day before the shooting. He agreed that the ammunition in his car was for the handguns and the rifle.

-13-

The Defendant testified that he had "associates," not friends, and that Mr. Jones was a friend before shooting the Defendant in the face. The Defendant said that the shooting occurred in connection with an argument about a ten-dollar debt. He denied that Perry was Mr. Jones's brother and said that Pierre was Mr. Jones's brother. The Defendant said that the argument occurred at Mr. Jones's home, that Mr. Jones asked the Defendant to leave, and that the Defendant refused because he wanted to fight Mr. Jones. The Defendant said that Mr. Jones called the police.

The Defendant testified that he told the police at the time of his arrest in this case that he ran because he knew he had outstanding arrest warrants. He agreed he told the police that he was the only person who fired a shot. He said that he went downtown to meet his friends, Donaldson and Jasmine Lundy, at a parking garage.

The Defendant testified that he did not intend to kill Ms. Johnson and that "everything that was happening . . . was a mistake." He said that the front windows in his car were not tinted but that the rear windows were slightly tinted. He said that he lowered his windows before the shooting because he turned off the air conditioning due to the car's having low gas. When asked who was his target, the Defendant stated, "Nobody was my target." He said that the woman in the jail call was his son's mother and that he stated during the call Ms. Johnson was not his target because he did not have a target. He said that he did not attempt to kill anyone and that he "tried to keep from being murdered in cold blood out in the middle like they just let him shoot me." He acknowledged that police officers were in the area. When asked why he did not ask any of the officers for help, the Defendant said that "[t]hey had guns and they have the guns right here," that the officers were "up ahead," and that "if they [were] bold enough to pull guns out in front of the police and shoot me or --."

The Defendant testified that he did not tell any of the police officers in the area that he had been afraid of anyone and that he fled the scene. He said that he wanted to dispose of the rifle before he was stopped by the police because he feared the officers would shoot him. He said later, though, that he disposed of the rifle because he could not control the car after the engine blew. He denied that he wanted to dispose of the rifle because it was a murder weapon. He said that he did not know anyone had been shot before his arrest. He said that he did not intend to murder anyone, that he did not go downtown to shoot Ms. Johnson, and that he did not go downtown to see Mr. Abston, Mr. Jones, and Perry. He said that he carried a firearm at all times because he had been shot previously and that he had been "constantly . . . shot at."

Upon this evidence, the jury convicted the Defendant of first degree premediated murder of Ms. Johnson, attempted first degree premeditated murder of Mr. Abston, and employing a firearm during the commission of a dangerous felony. This appeal followed.

-14-

## I. Sufficiency of the Evidence

The Defendant contends that the evidence is insufficient to support his convictions for first degree premeditated murder and attempted first degree premeditated murder. He does not challenge the firearm conviction. He argues that the evidence failed to establish that he acted with the intent to kill and with premeditation. He asserts, rather, that the evidence reflects he acted in self-defense.

In determining the sufficiency of the evidence, the standard of review is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see State v. Vasques*, 221 S.W.3d 514, 521 (Tenn. 2007). The State is "afforded the strongest legitimate view of the evidence and all reasonable inferences" from that evidence. *Vasques*, 221 S.W.3d at 521. The appellate courts do not "reweigh or reevaluate the evidence," and questions regarding "the credibility of witnesses [and] the weight and value to be given the evidence . . . are resolved by the trier of fact." *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997); *see State v. Sheffield*, 676 S.W.2d 542, 547 (Tenn. 1984).

"A crime may be established by direct evidence, circumstantial evidence, or a combination of the two." *State v. Hall*, 976 S.W.2d 121, 140 (Tenn. 1998); *see State v. Sutton*, 166 S.W.3d 686, 691 (Tenn. 2005). "The standard of review 'is the same whether the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).

Relevant to this case, first degree murder is the unlawful, intentional, and premeditated killing of another. T.C.A. § 39-13-202(a)(1). In the context of first degree murder, intent is shown if the defendant has the conscious objective or desire to cause the victim's death. *State v. Page*, 81 S.W.3d 781, 790-91 (Tenn. Crim. App. 2002); T.C.A. § 39-11-106(a)(18) (2018) (defining intentional as the "conscious objective or desire to engage in the conduct or cause the result"). "[A] defendant's conscious objective need not be to kill a specific victim." *Millen v. State*, 988 S.W.2d 164, 168 (Tenn. 1999). However, the evidence must establish that a defendant had the "conscious objective to kill a person," meaning that a "defendant intended to cause . . . the death of a person." *Id*. A premeditated act is one which is

> done after the exercise of reflection and judgment. "Premeditation" means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill preexist in the mind of the accused for any definite period of time. The mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to

-15-

determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation.

*Id.* § 39-13-202(d). The question of whether a defendant acted with premeditation is a question of fact for the jury to be determined from all of the circumstances surrounding the killing. *State v. Davidson*, 121 S.W.3d 600, 614 (Tenn. 2003). Proof of premeditation may be shown by direct or circumstantial evidence. *State v. Brown*, 836 S.W.2d 530, 541 (Tenn. 1992). As a result, the jury "may infer premeditation from the manner and circumstances of the killing." *State v. Jackson*, 173 S.W.3d 401, 408 (Tenn. 2005); *see State v. Vaughn*, 279 S.W.3d 584, 595 (Tenn. Crim. App. 2008). Factors from which a jury may infer premeditation include:

> [D]eclarations by the defendant of an intent to kill, evidence of procurement of a weapon, the use of a deadly weapon upon an unarmed victim, the particular cruelty of the killing, infliction of multiple wounds, preparation before the killing for concealment of the crime, destruction or secretion of evidence of the murder, and calmness immediately after the killing.

*State v. Nichols*, 24 S.W.3d 297, 302 (Tenn. 2000).

Likewise, a defendant commits criminal attempt when he acts "with the kind of culpability otherwise required for the offense . . . [and] [a]cts with intent to cause a result that is an element of the offense, and believes the conduct will cause the result without further conduct on the person's part[.]" T.C.A. § 39-12-101(a)(2).

Viewed in the light most favorable to the State, the evidence shows that on the day before the shooting, the Defendant traded two handguns for a high-powered assault rifle. Armed with the rifle, the Defendant drove his car toward Beale Street, stopped at red light, lowered the window, pointed the rifle, and fired two shots. Witness testimony established that the Defendant fired the first shot, paused, and fired the second shot. Ms. Green recalled that the Defendant and the members of her group stared at each other and that the Defendant did not speak to anyone before firing the rifle twice. Although the Defendant denied that Ms. Johnson was his intended "target," he admitted firing the rifle in a jail telephone call. Each victim was shot in the buttocks, and the jury could have reasonably inferred that the victims were running away from the Defendant at the time he fired the rifle.

Likewise, the Defendant fired the rifle twice upon an unarmed group of people, and the evidence does not show that the people in the group provoked the Defendant. After the shooting, the Defendant fled the scene, did not attempt to render assistance to Ms. Johnson and Mr. Abston, and disposed of the rifle during a high-speed police pursuit. Although the Defendant asserted that the did not intend to kill anyone, the jury's verdict reflects that it discredited the Defendant's testimony. We conclude that the jury could have determined

beyond a reasonable doubt that the Defendant acted with the conscious objective to cause the death of a person and that his conduct resulted in Ms. Johnson's death and Mr. Abston's non-fatal injuries. The evidence also supports the jury's determination that the Defendant acted with premeditation.

To the extent that the Defendant contends that he acted in self-defense, we note that questions of witness credibility and the weight to be afforded the evidence are within the exclusive province of the jury as the trier of fact. The Defendant testified about the 2014 shooting in which Mr. Jones shot the Defendant in the face and the ensuing tension with Mr. Jones and Mr. Abston. The Defendant told the jury about Mr. Abston's posting a photograph of the Defendant's facial injuries, which resulted in other's making crude comments about the Defendant. The Defendant, likewise, explained that he remained in fear for his safety after the 2014 shooting, that he always carried a firearm for protection afterward, that he saw Mr. Jones and Mr. Abston for the first time after the 2014 shooting on the night of the shooting in the present case, and that he believed the men were going to shoot him. We note that the trial court provided the jury with a self-defense instruction relative to the attempted first degree premeditated murder of Mr. Abston. As a result, the jury had the opportunity to evaluate the Defendant's testimony, and the jury's verdict reflects that it discredited it. We will not reweigh the evidence. *See Bland*, 958 S.W.2d at 659; *Sheffield*, 676 S.W.2d at 547. The evidence is sufficient to support the Defendant's convictions. He is not entitled to relief on this basis.

## II. Witness Testimony

The Defendant contends that the trial court erred by prohibiting him from presenting evidence of previous threats and violence against him. He argues that the evidence would have supported his claim of self-defense and that the trial court abused its discretion by determining that the evidence was irrelevant. The Defendant asserts that he should have been permitted to present Memphis Police Sergeant Michael Chipman as a defense witness and that the Defendant should have been permitted to testify about previous incidents of violence against him in an effort to establish he acted in self-defense on the night of the shooting.

"The Sixth Amendment and the Due Process Clause of the Fourteenth Amendment clearly guarantee a criminal defendant the right to present a defense which includes the right to present witnesses favorable to the defense." *State v. Brown*, 29 S.W.3d 427, 432 (Tenn. 2000); *see Washington v. Texas*, 388 U.S. 14, 119 (1967). However, admissibility of evidence is limited to that which is relevant. Tenn. R. Evid. 402. Evidence is relevant and generally admissible when it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401, 402. Questions regarding the admissibility and relevance of evidence generally lie within the discretion of the trial court,

and the appellate courts will not "interfere with the exercise of that discretion unless a clear abuse appears on the face of the record." *State v. Franklin*, 308 S.W.3d 799, 809 (Tenn. 2010) (citing *State v. Lewis*, 235 S.W.3d 136, 141 (Tenn. 2007)).

A trial court abuses its discretion when it applies an incorrect legal standard or reaches a conclusion that is "illogical or unreasonable and causes an injustice to the party complaining." *State v. Ruiz*, 204 S.W.3d 772, 778 (Tenn. 2006). Relevant evidence, however, "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Tenn. R. Evid. 403.

## A.    Memphis Police Sergeant Michael Chipman

At a jury-out hearing, the defense requested permission to call Sergeant Chipman in order to establish that Sergeant Chipman obtained a statement from Albert Jones after the shooting in this case. The State objected, and the defense made an offer of proof. Sergeant Chipman's anticipated testimony would have been that, at the request of the lead investigator, he interviewed and obtained a statement from Mr. Jones. Sergeant Chipman said that he provided Mr. Jones's statement to the lead investigator.

Trial counsel explained to the trial court that the purpose of the testimony was to establish "contact with Mr. Jones." Counsel said that the she wanted to show that "there were all the individuals who were involved in that altercation not all names were named." The court responded that the anticipated testimony did not establish this and found that the evidence was speculative. Counsel argued that "those witnesses were obviously not coming forward with their best testimony and it's very important to my defense . . . to be able to introduce evidence of why coming forward and could be the issue with those witnesses. And Sergeant Chipman is helping me in that process" to show that he talked to Mr. Jones. When the court inquired about how the anticipated testimony would "contradict" the State's evidence, counsel responded,

> because there was a reason why the element -- I mean, the events occurred . . . the way they did. So yes, there is a reason for them and I'm not revealing the testimony of the other individuals . . . . I'm saying that the presence of Mr. Albert Jones -- Albert Jones was there according to my witnesses and my theory of the case.
>
> And it's important that I show progression of what happened and what kind of event followed that appearance of Mr. Jones.

-18-

The trial court determined that the Defendant's right to present a defense was "not absolute" and that the defense was required to comply with the rules of procedure and evidence. After reviewing Tennessee Rules of Evidence 401 and 403, the court determined that the anticipated testimony was not relevant. Trial counsel argued, though, that the testimony confirmed Mr. Jones's presence at the scene, a position the State disputed. The court disagreed and determined that the defense would have to elicit hearsay evidence from Sergeant Chipman to establish whether Mr. Jones was present for the shooting. The court found that the anticipated testimony was irrelevant to the charged offenses. The court likewise found that the evidence would be cumulative because other witnesses had testified that Mr. Jones was present at the shooting. However, after reviewing its notes, the court found that Rodneshia Green testified that she did not know Mr. Jones and that Roderick Green was not asked any questions about Mr. Jones. The court found that Ms. Owens's testimony did not reflect that she saw Mr. Jones at the scene.

The prosecutor advised the trial court that Mr. Jones told the police that he was not present at the time of the shooting and did not know anything about it. Trial counsel argued that witnesses had testified Mr. Jones was present and that Sergeant Chipman's testimony was "introductory" evidence that allowed counsel to present the defense. However, the court determined that the evidence was not relevant and noted that the mere fact an officer spoke to a person about a shooting did not render the person's statement relevant to the investigation. The court found that even if the evidence were relevant, it would "simply lead to confusion."

We conclude that the trial court did not abuse its discretion by excluding Sergeant Chipman's anticipated testimony that, during the police investigation, he spoke to Mr. Jones after the shooting in this case. Trial counsel stated that this testimony would establish that Mr. Jones was at the scene of the shooting, although the State's witness did not establish his presence. The record reflects that Ms. Green and Ms. Owens testified that they did not know Mr. Jones and that Mr. Green was not questioned about whether he knew or saw Mr. Jones at the scene of the shooting. In any event, the fact that Sergeant Chipman spoke to Mr. Jones about the shooting does not establish Mr. Jones was present at the scene. Furthermore, Sergeant Chipman would not have been permitted to testify about the substance of his interview with Mr. Jones, as it would have elicited inadmissible hearsay evidence. *See* Tenn. R. Evid. 801, 802. In addition, the prosecutor stated that Mr. Jones denied being at the scene at the time of the shooting. As a result, the jury would have been required to speculate about the substance of the interview, which could have misled the jury and created confusion. Therefore, the trial court did not abuse its discretion by prohibiting Sergeant Chipman's testimony. The Defendant is not entitled to relief on this basis.

-19-

**B.     The Defendant**

**1.     Roadway Incident**

During the Defendant's direct testimony, trial counsel advised the trial court during a bench conference that she wanted to present evidence of a previous incident of violence which occurred when the Defendant and his sister were riding inside a vehicle with an unidentified person.  Counsel advised that the person was shot and later died, that the car in which they were riding was "pursued by a car," and that they were almost run off the road.  Counsel said the incident was an attack against the Defendant and was relevant to show a pattern of behavior from Mr. Jones, Mr. Abston, and Perry.  Counsel stated that the theory of the case was self-defense, that the defense had established "a pattern of reasonable belief that [the Defendant] was in imminent danger when he saw those three [men] crossing the street with a weapon and responded."

The trial court terminated the bench conference and held a jury-out hearing in order for trial counsel to present an offer of proof about the incident.  The Defendant stated that in 2015, he drove his sister's car, that he was with his sister and cousin, that he stopped at a traffic light, that a car almost ran his sister's car off the road, and that a man inside the car displayed a firearm and attempted to "shoot us."  The Defendant said that the car he drove almost spun out of control and that "everyone bailed out of the car" and ran.  The Defendant said that he called his sister and cousin back to the car, that his sister was able to get to the car, and that his cousin told the Defendant to leave and to return for the cousin later.  The Defendant said that his sister dropped him off at an unspecified location because he knew that "whoever it was" would be looking for him.  He said that five minutes later, he received a telephone call informing him that his cousin had been "killed in that same area right after we had driven off."  The Defendant said that although he provided a statement to the police, the case had not been "resolved."  When asked if he had evidence showing that Mr. Jones, Mr. Abston, and Perry were involved in this incident, the Defendant said, "Only evidence I have was sight.  It's just from me I'm sure.  But I don't have no legal proof, no paperwork, or nothing like that."  The Defendant said that he knew who was trying to kill him that day.  When the court asked the Defendant to explain, he said that he did not know the man who displayed the firearm but that he knew the man driving the car.  The Defendant said, though, that the driver was not Mr. Jones, Mr. Abston, or Perry.

Trial counsel argued that "[t]his is a fear issue" and that purpose of the previous incident was to show "the actions of other[s] who are all connected to individuals who were on the scene [of the shooting] and attributed to [the Defendant's] being in fear for his life and reacting the way he did."  The trial court determined that the evidence was not relevant to establishing a theory of self-defense because the incident did not involve Mr. Jones, Mr. Abston, and Perry.  The court determined that the evidence would mislead and confuse the

jury.  The court found that who shot at and attempted to run the Defendant off the road was "speculative."

We conclude that the trial court did not abuse its discretion by prohibiting the Defendant from testifying about this previous incident of violence.  Although the intended purpose of the evidence was to establish the Defendant's fear of Mr. Jones, Mr. Abston, and Perry and to explain his reaction to seeing the men at the scene on the night of the shooting in this case, the anticipated testimony would not have connected these men to the incident described by the Defendant.  The Defendant stated that none of the men had been the driver of the car and that he did not know the shooter.  The Defendant's belief or suspicion, without more, that Mr. Jones, Mr. Abston, and Perry were somehow involved in this incident is insufficient to show the men were, in fact, involved.  As a result, the anticipated testimony was not relevant to establishing why the Defendant could have been in fear of his life from Mr. Jones, Mr. Abston, and Perry on the night of the shooting in this case.  Likewise, the jury would have been required to speculate who had been involved in this previous incident and whether the incident was connected to the shooting in this case.  As a result, the anticipated testimony was irrelevant.

In reaching this conclusion, we note that the Defendant testified before the jury about the 2014 shooting incident and surrounding events, during which Mr. Jones shot the Defendant in the face and Mr. Abston posted crude comments about the Defendant on the Internet.  The jury, therefore, heard evidence of the Defendant's fears of Mr. Jones and Mr. Abston.  The Defendant is not entitled to relief on this basis.

## 2.    Alleged "Hit"

At the jury-out hearing, the defense continued its offer of proof relative to another previous incident of violence against the Defendant.  The Defendant stated that in 2016, not long before the shooting in this case, his daughter's mother told him that the police had spoken with her aunt and that the police reported there "was supposed to be a hit" to kill the Defendant and his daughter's mother.  The Defendant said that he was warned to stay "out of harm's way" and to hide.  He said that the police did not identify the alleged assailant.

The trial court determined that the incident involved an unknown person based upon hearsay.  The court found that the evidence did not reflect that Mr. Jones, Mr. Abston, and Perry were connected with the alleged hit.  The court said that general threats against the Defendant did not provide

> carte blanche . . . to shoot and kill people if you believe that somebody had threatened you before and if somebody else is engaged in any activity that you believe might be related [to] something else that has happened to you by

-21-

other people it's okay to kill that person and say as a result of my history I killed this person because I've had some problems with other people. And that's simply not the law.

The court determined that the evidence was not relevant to events in this case because the events described in the offer of proof did not relate to the men whom the Defendant alleged pulled out a firearm at the time of the present shooting. The court likewise found that the probative value was substantially outweighed by the risk of unfair prejudice. The court stated that although the Defendant "might strongly have a presumption" that the men were involved in the previous incidents, the Defendant did not present evidence to establish it.

We conclude that the trial court did not abuse its discretion by prohibiting the Defendant from testifying about an alleged hit from an unidentified person. The anticipated testimony could have elicited inadmissible hearsay evidence and did not connect Mr. Jones, Mr. Abston, and Perry to the alleged hit. The Defendant stated that the police did not identify the alleged assailant. As a result, the anticipated testimony would have required the jury to speculate about who was involved in the incident, creating confusion for the jury. As a result, the evidence was not relevant as to why the Defendant could have been in fear of his life from Mr. Jones, Mr. Abston, and Perry.

In determining that the Defendant is not entitled to relief, we have considered his argument that although all of the individuals involved in the incidents described by the Defendant were not at the scene of the shooting in this case, the anticipated testimony about the previous events would have shown these individuals were close friends, together often, "in a neighborhood gang," and "appeared to have death wishes for" the Defendant. However, the Defendant's offer of proof did not establish the identity of any person involved in the previous incidents, and, as a result, did not establish that any of the alleged perpetrators were friends, together often, in a gang, and had a death wish for the Defendant. Likewise, the offer of proof did not establish that any of the preparators involved in these incidents were at the scene of the shooting in the present case. As a result, the Defendant is not entitled to relief on this basis.

In consideration of the foregoing and the record as a whole, the judgments of the trial court are affirmed.

_____
ROBERT H. MONTGOMERY, JR., JUDGE

-22-